S. D. ELLISON v. J. W. HUNSINGER; CRESPI COTTON COMPANY, A CORPORATION; PLANTERS & MERCHANTS WAREHOUSE, INC.; J. E. NOGGLE, MANAGER OF PLANTERS & MERCHANTS WAREHOUSE, INC.; A. B. FAIRLEY, STATE WAREHOUSE SUPERINTENDENT; AND BRANDON P. HODGES, TREASURER OF THE STATE OF NORTH CAROLINA.

(Filed 6 May, 1953.)

1. Courts § 14—

In an action to determine title to personalty sold to an innocent purchaser for value by a wrongdoer who obtained possession from the true owner by false pretense, the law of the state of the *situs* of the personalty controls, and will be applied in an action instituted in this State unless contrary to the public policy of this State.

2. Sales § 12½—

Under the law of South Carolina, which is in accord with the general rule, a person who obtains possession of personalty from the true owner by false pretense has no title and cannot transfer title even to a *bona fide* purchaser for value without notice, unless some principle of estoppel intervenes. This rule of law will be applied in this State under the doctrine of comity, since it is not contrary to public policy of this State.

3. Courts § 14—

The *lex loci* will be applied under the doctrine of comity unless it is made to appear that it is against good morals or natural justice or that for some other reason the enforcement of it would be prejudicial to the general interest of the citizens of the forum, and therefore against public policy.

4. Sales § 12½: Principal and Agent § 7c—True owner held not estopped to assert title as against bona fide purchaser from wrongdoer obtaining possession of personalty by false pretense.

A wrongdoer obtained possession of a number of bales of cotton by false pretense from the true owner in South Carolina, by representing that he was agent of a reputable dealer and was taking possession for such dealer who would pay the true owner for the cotton. The wrongdoer then stored the cotton in a warehouse and sold the cotton to an innocent purchaser for value without notice by transfer of the warehouse receipts. *Held:* The wrongdoer having obtained possession of the cotton from the true owner by false pretense, was not in any way an agent for the true owner in the sale of the cotton, and the mere fact of his possession of the cotton is insufficient to estop the true owner from asserting his title even against the innocent purchaser who dealt with the wrongdoer on the faith of his apparent ownership or apparent authority to sell.

5. **Warehousemen § 3d—Where true owner is deprived of title to his cotton by operation of G.S. 106-442, he must be compensated therefor under due process of law.**

A wrongdoer obtained possession of certain bales of cotton by false pretense, stored the cotton in a warehouse and obtained negotiable receipts from the warehouse without being required to sign the certificates of ownership on the bottom thereof (G.S. 106-442). The wrongdoer then transferred the cotton by negotiating the receipts to an innocent purchaser for value without notice, and appropriated the proceeds of sale. *Held:* By virtue of G.S. 106-442 the purchaser obtained absolute title to the cotton, but the true owner may not be deprived of his property without due process of law, and is entitled to recover the value of the cotton against the bond of the warehouse manager and the warehouse if the loss were occasioned by any default in the faithful performance of their obligations (G.S. 106, Art. 38), or the bond of the State Warehouse Superintendent if the loss were occasioned by any default by him in the faithful performance of his duties, or, if the loss is not covered by such bonds, then under the indemnifying or guarantee fund created by G.S. 106-435.

6. **Appeal and Error § 50—**

Where the agreed statement of facts is insufficient to enable the Court to determine the questions presented by the appeal, the cause must be remanded.

7. **Same—**

Where parties necessary for a final determination of the cause are not parties of record, the cause will be remanded.

8. **Judgments § 18—**

Where one of the parties files no pleading, does not consent to the agreed statement of facts or to the hearing by the judge in chambers in another county, the court has no jurisdiction to sign judgment against him.

9. **Appeal and Error § 1—**

The Supreme Court will take notice of a defect of jurisdiction *ex mero motu.*

APPEAL by plaintiff from *Rudisill, Resident Judge* of the 16th District, in Chambers in the courthouse in Catawba County, 30 December, 1952. CLEVELAND.

This is a civil action instituted in Cleveland County to recover 43 bales of lint cotton, or if recovery of the cotton cannot be had for its market value, possession of said cotton having been allegedly obtained from the plaintiff by the crime of false pretense by Hunsinger. The action came on to be heard before the Resident Judge in Catawba County in chambers upon an agreed statement of facts, by consent of all the parties, except the defendant Hunsinger, who was a party defendant, but filed no answer, and is now serving a three-year sentence in the Penitentiary in South Carolina for obtaining this cotton by false pretense from the plaintiff.

For the sake of brevity the Crespi Cotton Company will be called the Cotton Company, and the Planters & Merchants Warehouse, Inc., the Warehouse, Inc. The plaintiff instituted suit against Hunsinger, the Cotton Company, and the Warehouse, Inc. Upon motion of the Cotton Company, A. B. Fairley, State Warehouse Superintendent, and Brandon P. Hodges, Treasurer of the State of North Carolina, in their official capacity were made defendants, and the Cotton Company filed a cross-action against Fairley and Hodges, in their official capacity, and against the Warehouse, Inc. Upon motion of Fairley and Hodges, J. E. Noggle, Manager of the Warehouse, Inc., and the surety upon his bond, the Indemnity Insurance Company of North America, were made defendants. Noggle filed an answer. The plaintiff filed an amendment to his complaint. Then Noggle and the Indemnity Insurance Company of North America filed a demurrer to the plaintiff's complaint and its amendment and to the further answer and defense of Fairley and Hodges for alleged failure to state any cause of action against either of them. The demurrer was heard by Crisp, J., at the September 1952 Term of the Cleveland County Superior Court, and Crisp, J., sustained the demurrer of the Insurance Company and overruled the demurrer of Noggle. To this judgment upon the demurrer the plaintiff and the defendants, the Cotton Company, Fairley and Hodges excepted and appealed to the Supreme Court. The appeal has not been perfected by any of them.

On 13 February, 1951, the Cotton Company and the plaintiff entered into the following agreement: In order for the Cotton Company to sell the 43 bales of cotton it is agreed that if the plaintiff is entitled to recover the cotton on the grounds of fraud practiced by Hunsinger, and that title did not pass to Hunsinger, then the plaintiff shall recover the present market value of the cotton from the Cotton Company in place of recovering the actual cotton. This agreement is made so that the Warehouse, Inc., may turn over the actual cotton to the Cotton Company without the plaintiff admitting any right of the Cotton Company to the cotton.

Later on the plaintiff, the Cotton Company, the Warehouse, Inc., Fairley and Hodges, by their counsel of record, signed an agreed statement of facts, and by consent of all parties, except Hunsinger, the case was heard upon the agreed statement of facts by Rudisill, J., in chambers. The agreed statement of facts was signed by Joseph C. Whisnant, attorney for Planters & Merchants Warehouse, Inc., alone. The judgment of Rudisill, J., states that this cause by consent of all parties, except Hunsinger, came on to be heard upon an agreed statement of facts and upon the pleadings filed by all the parties hereto and was heard. The agreement as to what should constitute the case on appeal was signed by Joseph C. Whisnant, as joint counsel for Planters & Merchants Warehouse, Inc., and J. E. Noggle, Manager of Planters & Merchants Ware-

house, Inc. A brief was filed by Joseph C. Whisnant as joint counsel for the Warehouse, Inc., and J. E. Noggle, Manager of the Warehouse, Inc., as appellees. The defendant Noggle makes no contention in his brief that he did not consent to the agreed statement of facts. Therefore, it would seem that Noggle, who as a defendant, filed an answer with Joseph C. Whisnant as his attorney, consented to the agreed statement of facts.

This is a summary of the agreed statement of facts:

1. The plaintiff lives in Fairfield County, South Carolina. About 18 January, 1951, Hunsinger came to his house, and represented that he wanted to get some samples of cotton for V. F. Cooley, a cotton broker of Spartanburg, South Carolina. The plaintiff gave him the samples, and thereafter talked by telephone with Cooley relative to purchasing said cotton. Cooley had sent Hunsinger to the plaintiff to get cotton samples, and during his conversation with the plaintiff, Cooley asked the plaintiff to telephone him in Spartanburg at a given number to talk further about a sale of the cotton after Cooley had seen the samples. Hunsinger left with the samples. Later the plaintiff called this telephone number, and Hunsinger came to the telephone, and informed the plaintiff "We have decided to buy the cotton and will come for it tomorrow." That afternoon Hunsinger arrived at the plaintiff's home with one truck with North Carolina plates on it. Hunsinger told the plaintiff that Cooley had sent him for the cotton, which had been sold to a mill in North Carolina, and that the cotton would be taken to Shelby, North Carolina, and put in a warehouse there. Hunsinger told the plaintiff that Cooley was worried about the cotton being in the open; that it was raining in Spartanburg. Hunsinger told the plaintiff of numerous trips he had made for Cooley buying cotton at various points. 43 bales of lint cotton owned by the plaintiff were loaded on the truck, and Hunsinger left.

2. Hunsinger carried the 43 bales of cotton to the Planters & Merchants Warehouse, Inc., in Shelby, North Carolina, a bonded warehouse operating under the provisions of G.S., Ch. 106, Art. 38, and the Warehouse, Inc., issued warehouse certificates therefor, as set out in exhibits attached to the complaint, under date of 19 January, 1951, in the name of Hunsinger. At the time of issuance of said negotiable warehouse receipts the Warehouse, Inc., did not require Hunsinger to sign the certificates of ownership on the bottom of each of said receipts.

3. Hunsinger carried the 43 warehouse receipts, together with samples of the cotton represented by the receipts, to the office of the Crespi Cotton Company in Charlotte, North Carolina, and sold the cotton to the Crespi Cotton Company receiving from it its cheque dated 19 January, 1951, in the amount of $8,878.85—representing the sale of the cotton at the price of 44.75c per pound. At the same time Hunsinger endorsed each of the

43 warehouse receipts, and delivered them to the Cotton Company. The endorsement above the signature of Hunsinger bears the following words: "Each of the undersigned hereby certifies on the date stated that he is the owner of the cotton covered by this receipt and that, other than the warehouseman's lien evidenced on the face of this receipt and the following, there are no liens, mortgages, or other encumbrances on said cotton." Nothing else appeared below Hunsinger's signature except the date 19 January, 1951.

4. The Cotton Company bought this cotton from Hunsinger by its agent, Otto Lylerly, who had bought cotton from Hunsinger for about 8 years. Hunsinger represented to Lylerly that the 43 bales of cotton were his cotton, and that the Cotton Company purchased this cotton in good faith and without notice of any defect in the title of Hunsinger.

5. On 23 January, 1951, Noggle, Manager of the Warehouse, Inc., telephoned one Johnston of the Cotton Company in Charlotte, North Carolina, and said that he was trying to find out who had bought some cotton from Hunsinger in the past day or two. Johnston informed Noggle that the Cotton Company had purchased some cotton from Hunsinger within the past few days. The next day the plaintiff came to Charlotte, North Carolina, and advised Johnston how Hunsinger had obtained possession of his cotton. Immediately after Noggle's conversation with Johnston the Cotton Company endeavored to stop payment on its cheque to Hunsinger, but the bank had already paid the cheque.

6. Hunsinger did not obtain possession of the cotton from the plaintiff for Cooley, and was not acting as agent for Cooley at the time; and Cooley had no knowledge that Hunsinger had procured possession of the plaintiff's cotton or that Hunsinger over the telephone had agreed to purchase the cotton from the plaintiff on behalf of Cooley.

7. On 4 September, 1951, Hunsinger, in the Court of General Sessions for Fairfield County, South Carolina, pleaded guilty to a bill of indictment for false pretense in obtaining said cotton from the plaintiff; in that he did falsely represent that he was purchasing the cotton for Cooley; that Cooley would pay the plaintiff the agreed price, and that he was sent by Cooley to the plaintiff to get the cotton, and that by said false pretense and representations he did get the cotton from the plaintiff. Whereupon Hunsinger was sentenced by said Court to serve three years in the State Penitentiary of South Carolina, and he is now serving his sentence. Hunsinger has not filed an answer or other pleading in this action.

8. Before Hunsinger obtained possession of the 43 bales of cotton, he falsely represented to the plaintiff that he was getting the cotton for Cooley, and that Cooley would pay for the cotton at the agreed price when the same was delivered for Cooley at the warehouse and weighed; that Cooley would not accept the ginner's weight, and that payment would be

made by Cooley immediately by cheque upon the basis of the warehouse weights; that the plaintiff would not have turned his cotton over to Hunsinger but for these representations, because the plaintiff had previously investigated the reputation of Cooley as to payments in carrying out his agreements, and found that Cooley was reliable and financially able to meet his obligations; that the plaintiff believed he was delivering the cotton to Hunsinger for Cooley; and because of Hunsinger's false representations and because he had previously sent samples of his cotton to Cooley, and he had talked with Cooley over the telephone about the cotton, and Cooley had requested him to call him back, and also because Hunsinger represented over the telephone that Cooley would take the cotton, the plaintiff delivered the cotton to Hunsinger for Cooley. The plaintiff has never received payment for his cotton, and he has been damaged in the amount equal to the market value of the cotton on said date.

Upon the agreed statement of facts the Court signed the judgment that the plaintiff have and recover from the defendant Hunsinger $8,878.85 with interest from 18 January, 1951; that the plaintiff recover nothing from all the other defendants, and dismissed the action as to them; and taxed Hunsinger with the costs.

From the judgment signed the plaintiff appeals to the Supreme Court, assigning error.

*D. Z. Newton, Peyton McSwain, and George F. Coleman for plaintiff, appellant.*

*Tillett, Campbell, Craighill & Rendleman for defendant Crespi Cotton Company, appellee.*

*Joseph C. Whisnant for defendants Planters & Merchants Warehouse, Inc., and J. E. Noggle, Manager of Planters & Merchants Warehouse, Inc., appellees.*

*Attorney-General McMullan and Assistant Attorney-General Bruton for defendants A. B. Fairley, State Warehouse Superintendent, and Brandon P. Hodges, Treasurer of the State of North Carolina, appellees.*

PARKER, J.   Each state has the right to regulate the transfer of property within its limits. The prevailing modern theory is that the law of the *situs* in general controls transfers of personalty. All the transactions between the plaintiff Ellison and Hunsinger occurred in South Carolina; the 43 bales of cotton were situated in South Carolina; according to Hunsinger's representations, Ellison was to be paid by Cooley's cheque; Cooley lived in Spartanburg, South Carolina. Hunsinger obtained possession of the 43 bales of cotton from Ellison by the crime of false pretense—to which crime he pleaded guilty, and is now serving a prison

sentence in South Carolina. Whether Hunsinger acquired title to this cotton is to be determined according to the laws of the State of South Carolina, and the South Carolina law on the doctrine of comity in the forum will be enforced in the Courts of North Carolina, unless contrary to the public policy of this State. *Motor Co. v. Wood, ante,* 318, 75 S.E. 2d 312; *Price v. Goodman,* 226 N.C. 223, 37 S.E. 2d 592; 11 Am. Jur., Conflict of Laws, Sec. 66.

The facts in relation to one Hinson obtaining a Buick Convertible Coupe from Russell Willis, Inc., in the case of *Russell Willis, Inc., v. Page,* 213 S.C. 156, 48 S.E. 2d 627, are strikingly similar to Hunsinger obtaining this cotton from Ellison. On 11 May, 1947, Mrs. E. F. Stacker, H. J. Saltzman and one Bernard Hinson, the owner, general manager, and employee, respectively, of Farnsworth-Stacker, a reputable company, engaged in various lines of business at Clarksville, Tenn., a distance of about 40 miles from Nashville, Tenn., came into Russell Willis, Inc.'s place of business for the purpose of purchasing one or more Buick automobiles. At that time Russell Willis, Inc., had on hand a new four-door Buick Sedan and also a Buick Convertible Coupe. Mrs. Stacker purchased the four-door Sedan. While there Mrs. Stacker and especially Saltzman seriously considered buying the Convertible Coupe, which was priced to them at $3,595.00. As they were leaving Saltzman said: "He would send back and get the Buick Convertible for $3,595.00."

On 29 May, 1947, Hinson walked into the office of Russell Willis, Inc., and stated that he had come after the Buick Convertible Coupe for Saltzman. Hinson delivered to Russell Willis, Inc., a Farnsworth-Stacker printed cheque signed "E. F. Stacker," payable to Russell Willis, Inc., in the sum of $3,595.00. The signature to this cheque was a forgery.

*Baker, C. J.,* speaking for the Court, said: "The trial judge has very succinctly stated the governing law of this case as applied in South Carolina, and we quote therefrom. 'There can be no doubt that the plaintiff did not divest itself of title to said automobile by the purported sale to H. J. Saltzman upon the false and fraudulent representation of Hinson that he was authorized by Saltzman to purchase said car for and on his behalf. It follows that the defendant, Page, acquired no title in the purchase of the car from Hinson. Under such circumstances, ordinarily, the original seller is entitled to the recovery of his property even as against a subsequent *bona fide* purchaser for value and in good faith. See annotations contained in 13 L.R.A., N.S., at page 413, and L.R.A. 1916-D, 801. See, also, *M. Brotchiner & Sons, Inc., v. M. Ullman, Inc.* (141 Misc. 102), 252 N.Y.S. 244' . . . The law of neither the State of Tennessee nor that of the State of Virginia having been pleaded, we must assume that it is the same as in this State, and therefore the law of the forum will govern."

The annotation contained in 13 L.R.A., N.S., at page 416, states: "There are numerous other cases holding that title will not pass where the alleged purchaser has falsely represented himself to be an agent for some third party, as in that case there is no meeting of the minds." (Citing numerous authorities.)

In the annotation L.R.A. 1916-D, 801, it is said in part: "The reputation of a certain person or firm may be such that the party desires to contract with him and him only. If a mistake arises and such a party contracts with another in the belief that he is contracting with the desired person, the contract may be avoided. It is more accurate to say that no contract exists."

In *M. Brotchiner & Sons, Inc., v. M. Ullman, Inc.,* (141 Misc. 102), 252 N.Y.S. 244, a man represented himself to be a brother of Victor Goodman, a reputable fur dealer in Toronto, Canada, for whom he said he was authorized to make purchases of furs, and purchased a number of furs from the plaintiff by a cheque which purported to be signed by V. Goodman. The cheque was forged. The purported purchaser sold these furs to the defendant. On 11 May, 1929, the same individual, now representing himself to be Victor Goodman, appeared in Buffalo at the factory where the defendant is engaged in manufacturing and trading in furs. He stated that on account of delays incident to importation into Canada he desired to sell the furs at cost. In confirmation he exhibited the receipted bills received from the plaintiff, showing the sale of the furs to V. Goodman for $1,451. He gave also the name of his hotel in Buffalo. Inquiry by the defendant showed that a Victor Goodman was registered there. The defendant finally agreed to buy the furs for $1,400 and delivered its check for this amount, which was immediately paid. The plaintiff, having thereafter ascertained that the defendant was in possession of the furs, made demand for them, and, the demand having been rejected, began this suit. The New York Court said: "It is entirely clear under the circumstances here that the imposter acquired no title to the merchandise, and consequently that no title passed to the defendant. The imposter was only intrusted by the plaintiff with possession of the merchandise for transmission to his alleged principal. The plaintiff never sold nor did it intend any sale to him."

In *Chiplock v. Steuart Motor Co.,* Mun. Court of Appeals for the District of Columbia, 91 A. 2d 851, the Court said: "We think it is correct to say that when a seller purports to transfer title to one who is in fact a stranger to the transaction, no title (void, voidable, or otherwise) flows from the seller to a wrong doer who has fraudulently held himself out as agent of such stranger. This is so because one of the supposed parties to the legal transaction is actually wanting. In such a situation the seller may usually follow the property and recover it from an innocent pur-

chaser.  *Russell Willis, Inc., v. Page,* 213 S.C. 156, 48 S.E. 2d 627, and citing other authorities."

The South Carolina law that one who has acquired possession of property by a crime such as false pretense cannot transfer a better title than he himself has, even to a *bona fide* purchaser, unless some principle of estoppel comes into operation, is in accord with the general rule.  46 Am. Jur., Sales, Secs. 459 and 460.

It is stated in 77 C.J.S., Sales, page 1103 : "The defrauded owner of goods can recover them from a *bona fide* purchaser under one who has obtained them from the true owner by a pretended purchase for, or in behalf of, another person or of a firm, which representation of authority is false and fraudulent."   C.J.S. cites as authority for its statement *Russell Willis, Inc., v. Page, supra; Petty v. Borg,* 106 Utah 524, 150 P. 2d 776.

Under the South Carolina law title to the 43 bales of cotton remained in the plaintiff Ellison, and never passed to Hunsinger.  On the doctrine of comity in the forum this South Carolina law will be enforced in North Carolina, unless contrary to the public policy of this State.  This Court has said in *In re Chase,* 195 N.C. 143, at p. 148, 141 S.E. 471: "As pointed out in *R. R. v. Babcock,* 154 U.S. 190, 38 Law Ed., 958, to justify a court in refusing to enforce a right which accrued under the law of another state, because against the policy of our laws, it must appear that it is against good morals or natural justice, or that for some other such reason the enforcement of it would be prejudicial to the general interests of our own citizens (citing authorities).  And this is a matter which each state must decide for itself."  We find nothing in our own laws which declares it against public policy, good morals, or natural justice, or prejudicial to the general interest of our own citizens to recognize as a matter of comity the South Carolina law that the title to the 43 bales of cotton remained in the plaintiff, and never passed to Hunsinger.

It is a universal and fundamental principle of our law of personal property that the owner of such property cannot be divested of his ownership without his own consent, except, of course, by due process of law. *Dows v. Nat. Exch. Bank of Milwaukee,* 91 U.S. 618, 23 Law Ed. 214. The general rule of law is that a sale by a person who has no right to sell is not valid against the rightful owner.  Even a *bona fide* purchaser obtains no title or right by a purchase from one who is not the owner, or not authorized to sell, which he can assert as against the true owner in the absence of some element of estoppel.  It is a general rule that the fact that the owner has entrusted someone with mere possession and control of personal property is not sufficient to estop the real owner from asserting his title against a person who dealt with the one in possession on the faith of his apparent ownership or apparent authority to sell.  *Motor Co.*

*v. Wood, supra;* 46 Am. Jur., Sales, Secs. 458 and 460. Hunsinger acquired possession of the 43 bales of cotton from the plaintiff by the crime of false pretense: that is not sufficient to estop the plaintiff from asserting his title to the cotton against anyone who dealt with Hunsinger on the faith of his apparent ownership or apparent authority to sell.

"Consent of both principal and agent is necessary to create an agency. The principal must intend that the agent shall act for him, the agent must intend to accept the authority and act on it, and the intention of the parties must find expression either in words or conduct between them. With respect to third persons, an agency may arise by necessity, from acts and appearances which lead others to believe that such a relation has been created, *i.e.,* by estoppel; or from operation of law." 2 Am. Jur., Agency, Sec. 21. Hunsinger obtained possession of the plaintiff's cotton by the crime of false pretense. That did not in any way make Hunsinger his agent as contended for by the defendants, the Warehouse, Inc., and Noggle, in their brief, and as contended by Fairley and Hodges in their brief.

G.S. Ch. 106, Art. 38, was enacted by the General Assembly to provide a modern system whereby cotton and other agricultural commodities might be more profitably marketed, and to give these products the standing to which they are justly entitled as collateral in the commercial world, a warehouse system for cotton and other agricultural products in the State of North Carolina is established. G.S. 106-432 provides that the provisions of this article shall be administered by the State Board of Agriculture, through a suitable person to be selected by said board, and known as the State Warehouse Superintendent; the State Board of Agriculture is empowered to make and enforce such rules and regulations as may be necessary to make effective the purposes and provisions of this article. G.S. 106-433 provides that the Board of Agriculture shall have authority to employ a warehouse superintendent, necessary assistants, local managers, etc., to carry out the provisions of this article. G.S. 106-434 provides that the State Warehouse Superintendent shall give bond to the State of North Carolina in the sum of $50,000.00 to guarantee the faithful performance of his duties; and the said superintendent shall, to safeguard the interests of the State, require bonds from local managers, etc., authorized in G.S. 106-433, in amounts as large at least as he may find ordinary business experience in such matters would suggest as ample. G.S. 106-435 states in substance: in order to provide a sufficient indemnifying or guarantee fund to cover any loss not covered by the bonds of the State Warehouse Superintendent and of others required by G.S. Ch. 106, Art. 38, to give bonds, and in order to provide the financial backing which is essential *to. make the warehouse receipts universally acceptable as collateral,* and in order to provide that a state warehouse system intended

to benefit all cotton growers in North Carolina shall be supported by the class it is designed to benefit; that on each bale of cotton ginned in North Carolina during a certain period 25 cents shall be collected through the ginner of the bales, and paid into the State Treasury to be held there as a special guarantee or indemnifying fund to safeguard the state warehouse system against any loss not otherwise provided: this fund shall be held in the State Treasury to the credit of the state warehouse system. G.S. 106-439 provides that the State Warehouse Superintendent shall have power to lease for stated terms property for the warehousing of cotton; and that it shall be his duty to foster and encourage the erection of warehouses in the various cotton-growing counties of the State for operation under the terms of this chapter and article, and to provide an adequate system of inspection, and of rules, forms, and reports to insure the security of the system, such matters to be approved by the State Board of Agriculture; and that cotton may be stored in such warehouses by persons owning it, and they shall receive all of the benefits accruing from such State management; and for such storage such persons shall pay to the manager of the warehouse such sums for storage as may be agreed upon subject to the rules of the State Board of Agriculture by the manager and owner of the cotton. G.S. 106-440 provides that the State Warehouse Superintendent shall have the power to sue, or to be sued, in the Courts of this State in his official capacity, but not as an individual, except in case of tort or neglect of duty, when the action shall be upon his bond.

G.S. 106-441 provides that when cotton has been stored in such warehouses official negotiable receipts of the form and design approved by the Board of Agriculture shall be issued for such cotton under the seal and in the name of the State of North Carolina, stating the location of the warehouse, the name of the manager, etc., so that on surrender of the receipt the identical cotton for which it was given may be delivered. The warehouse manager shall fill in the receipts, and they shall be signed by him or by the State Warehouse Superintendent or his duly authorized agent. `If the local manager cannot issue a negotiable receipt complete for the cotton, he shall issue nonnegotiable memorandum receipts therefor.

G.S. 106-442 provides that the official negotiable receipt issued for cotton stored in such warehouse is to be transferable by written assignment and actual delivery, and the cotton which it represents is to be deliverable only upon a physical presentation of the receipt. *The said official negotiable receipt carries absolute title to the cotton,* it being the duty of the local manager accepting the cotton for storage to satisfy himself as to the title to the same by requiring the depositor of the cotton to sign a statement appearing on the face of the official receipt to the effect that there is no lien, mortgage, or other valid claim outstanding against

such cotton, and any person falsely signing such a statement shall be punished as provided for false pretense.

The indemnifying or guarantee fund held in the State Treasury is to cover any loss not covered by the bonds required to be given by G.S. Ch. 106, Art. 38. If a loss is covered by such bonds, then the bonds are the primary fund from which to make good the default of their respective principals. G.S. 106-435; *Lacy v. Indemnity Co.,* 189 N.C. 24, 126 S.E. 316.

Speaking of G.S. Ch. 106, Art. 38, this Court said in *Bickett v. Tax Commission,* 177 N.C. 433, at p. 438, 99 S.E. 415 : "There was a 'Warehouse Receipts Act' enacted by the last General Assembly, ch. 37, Laws 1917, but it lacked (like a similar statute in S.C.) the essential feature of the tax of 25 cents per bale, which will raise probably $200,000 a year as a guarantee fund behind the warehouse certificates to guarantee such certificates and make them acceptable as collateral as it will insure the title of the cotton against litigation arising out of liens (which might be recorded in another county than where the mortgagee resides) or any other defects." Later on in the same case the Court said, at page 440 : ". . . the act provides that every bale of cotton can be stored, but requires that the real owner must first be determined and the warehouse receipts shall be in the name of such owner. It is true there may be some mistakes made, and for that reason the fund is provided to guarantee the holders of the warehouse certificates against loss." When this opinion was written Ch. 168, Sec. 12, Public Laws of North Carolina 1919, provided that it was the duty of the manager accepting cotton for storage, by inspection of the Register of Deeds office, to ascertain whether there were on file crop mortgages or liens for rent or laborers' liens covering said cotton before he accepted it and issued a receipt.

The General Assembly in 1921 enacted Ch. 137, Public Laws of North Carolina, and Sec. 12 provides: That it shall be the duty of the local manager accepting cotton for storage to satisfy himself as to the title to the same by requiring the depositor of the cotton to sign a statement appearing on the face of the official receipt to the effect that there is no lien, mortgage or other valid claim outstanding against such cotton. This section is now codified as G.S. 106-442.

These facts are admitted by the agreed statement of facts: (1) Hunsinger obtained possession of the plaintiff's 43 bales of cotton by the crime of false pretense; (2) the Warehouse, Inc., was a bonded warehouse operating under the provisions of G.S. Ch. 106, Art. 38, and J. E. Noggle was its manager; (3) on 19 January, 1951, Hunsinger stored these 43 bales of cotton in the warehouse of the Warehouse, Inc., and on said date the Warehouse, Inc., issued official negotiable receipts for the said cotton in the name of J. W. Hunsinger, and at the time of issuing said receipts the

Warehouse, Inc., did not require the said Hunsinger to sign the statement appearing on the face of the official receipt to the effect that there is no lien, mortgage, or other valid claim outstanding against the 43 bales of cotton; (4) that Hunsinger on 19 January, 1951, sold the 43 bales of cotton represented by these official negotiable receipts to the Cotton Company for $8,878.85, and transferred to the Cotton Company the said receipts by written assignment and actual delivery, and Hunsinger cashed the said cheque and received the money for the same; (5) this cotton was purchased in the ordinary course of business by the Cotton Company for value, in good faith and without notice of any defect in the title of Hunsinger.

Upon these agreed facts the title to the 43 bales of cotton remained in the plaintiff, and never passed to Hunsinger under the laws of South Carolina, and such law will be enforced in this forum; and further the plaintiff is not estopped to assert his title, nor was Hunsinger his agent. The authorities for these statements have been set forth before in this opinion. However, upon the agreed facts, by virtue of G.S. 106-442 the Cotton Company obtained absolute title to these 43 bales of cotton. *Lacy v. Indemnity Co.,* 193 N.C. 179, 136 S.E. 359; *Northcutt v. Warehouse Co.,* 206 N.C. 842, 175 S.E. 165.

As G.S. 106-442 divests the plaintiff of title to his 43 bales of cotton, and puts absolute title to the bales of cotton in the Cotton Company, it would be a taking of plaintiff's cotton without due process of law, and this section of the statutes would be unconstitutional, unless G.S. Ch. 106, Art. 38, provided that the plaintiff shall be paid full compensation for his cotton. G.S. Ch. 106, Art. 38, makes such provision for the payment of full compensation to the plaintiff for his cotton by making (1) the bond of Noggle, local Manager of the Warehouse, Inc., and his employer, the Warehouse, Inc., primarily responsible for the plaintiff's loss, if there has been any default of Noggle and the Warehouse, Inc., in the faithful performance of their obligations in operating a warehouse under the terms of G.S. Ch. 106, Art. 38; and if they are not responsible by making (2) the bond of Fairley, State Warehouse Superintendent, liable for plaintiff's loss, if there has been any default by him in the faithful performance of his duties as State Warehouse Superintendent; and (3) if the plaintiff's loss, or any part of it, is not covered by such bonds, and by the liability of the Warehouse, Inc., then the indemnifying or guarantee fund created by G.S. 106-435 and held in the State Treasury to the credit of the warehouse system is responsible to the plaintiff for his loss, or any part of his loss not covered by such bonds. *Lacy v. Indemnity Co.,* 189 N.C. 24, 126 S.E. 316; G.S. 106-434; 106-435; 106-439. This provision is made "in order to provide the financial backing which is essential to

make the warehouse receipt universally acceptable as collateral." G.S. 106-435.

The bonds of Noggle and Fairley are not part of the agreed facts. In the record is the form of a local Warehouse Manager's Bond purporting to be executed by the Indemnity Ins. Co. of North America, payable to the State, conditioned upon a local warehouse manager faithfully performing his obligations as a warehouseman, and setting forth the amount of Noggle's bond at $15,000.00.

Noggle, as local manager of the Warehouse, Inc., knew the risks involved if he issued official negotiable receipts for cotton stored in the Warehouse, Inc., in the name of one not the true owner; and if Noggle, as local manager, failed to use such diligence as would be used by an ordinarily prudent person under the same circumstances and charged with a like duty to satisfy himself as to the title to this cotton by requiring Hunsinger, the depositor of the cotton, to sign a statement appearing on the face of the official receipt to the effect that there is no lien, mortgage, or other valid claim outstanding against the said cotton, and issued official negotiable receipts for this cotton not in the plaintiff's name, then he failed in the faithful performance of his duties as local manager, and he and his bond, and his employer, the Warehouse, Inc., are liable to the plaintiff for the fair market value of his 43 bales of cotton as of 19 January, 1951. 50 Am. Jur., Suretyship, Sec. 337; Annos. 43 A.L.R. 980; 46 A.L.R. 977; 62 A.L.R. 412; 77 A.L.R. 862; 98 A.L.R. 1266.

If Noggle and the Warehouse, Inc., are not liable, and if Fairley, as State Warehouse Superintendent, failed in the faithful performance of his duties, then he and his bond are liable to the plaintiff for his loss. If Noggle and his bond, and the Warehouse, Inc., and Fairley and his bond are not liable to the plaintiff for all of his loss, then the loss to the plaintiff, or any part of it not covered as above set forth, must be paid by Brandon P. Hodges out of the guarantee or indemnifying fund held in the State Treasury. The plaintiff's loss is the fair market value of his 43 bales of cotton as of 19 January, 1951, with interest until paid—the day when the Warehouse, Inc., issued official negotiable receipts for this cotton in the name of Hunsinger, and Hunsinger sold the cotton to the Cotton Company and received payment for it.

The agreed statement of facts are insufficient for us to determine as between Noggle and his bond and his employer, the Warehouse, Inc.; Fairley and his bond and Brandon P. Hodges, Treasurer of the State of North Carolina and custodian of the indemnifying or guarantee fund, who shall pay the plaintiff for his loss. Therefore, this action must be remanded to the lower court for further proceedings in accordance with this opinion.

In order that these issues may be clearly presented, it would be preferable to redraft the pleadings.

The surety upon the bond of Noggle and the surety upon the bond of Fairley are necessary parties for a final determination of this action.

Hunsinger filed no answer or other pleading. He did not consent to the agreed statement of facts. He did not consent to the hearing in chambers in Catawba County. The Court had no jurisdiction to try the case against him, and sign judgment against him for $8,878.85 and costs, in chambers when and where it did. The trial of the case against him must be had in term time in Cleveland County, unless he consents that it be done elsewhere. We notice this *ex mero motu,* even though Hunsinger has no defense according to the facts as they appear in the record before us. *Cox v. Kinston,* 217 N.C. 391, 8 S.E. 2d 252.

The result, then, is that the judgment will be affirmed as to the Crespi Cotton Company; and error and remanded as to the Planters & Merchants Warehouse, Inc., J. E. Noggle, Manager of Planters & Merchants Warehouse, Inc., A. B. Fairley, State Warehouse Superintendent, and Brandon P. Hodges, Treasurer of the State of North Carolina.

Judgment against J. W. Hunsinger—Error and remanded.

Plaintiff's appeal as to Crespi Cotton Company—Affirmed.

Plaintiff's appeal as to Planters & Merchants Warehouse, Inc., J. E. Noggle, Manager of Planters & Merchants Warehouse, Inc., and A. B. Fairley, State Warehouse Superintendent, and Brandon P. Hodges, Treasurer of the State of North Carolina—Error and remanded.