681 F.2d 930
 10 Fed. R. Evid. Serv. 1048
 M. B. A. F. B. FEDERAL CREDIT UNION, Appellee,
v.
CUMIS INSURANCE SOCIETY, INC., Appellant,
v.
Jack G. MONTGOMERY, Helen R. Montgomery, Mary L. Morris,
Mary T. Smith, Third Party Defendants.
 No. 81-1285.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 7, 1981.
Decided June 17, 1982.
Rehearing Denied July 22, 1982.
 
 Robert J. Thomas, Columbia, S. C. (Tompkins, McMaster & Thomas, Columbia, S. C., on brief), for appellant.
 Jack T. Flom, Myrtle Beach, S. C. (Marshall, Flom, Haar & Sherrill, Myrtle Beach, S. C., on brief), for appellee.
 Before HALL, SPROUSE and CHAPMAN, Circuit Judges.
 PER CURIAM:
 
 
 1
 This is an appeal by Cumis Insurance Society, Inc., defendant below, from a judgment rendered against it in favor of Myrtle Beach Air Force Base Federal Credit Union (Credit Union) for $242,080.75 on a bond which covered, among other things, loss to the Credit Union through the failure of one of its employees "to well and faithfully perform his duties."
 
 
 2
 The Credit Union was created under the provisions of the Federal Credit Union Act, 12 U.S.C. §§ 1751 et seq. It is governed by a Board of Directors; however, approval of loan applications was vested in a three member Credit Committee, pursuant to 12 U.S.C. § 1761c.
 
 
 3
 Prior to June 1973, John Stowe approached Jack Montgomery, general manager of the Credit Union, about a real estate loan.[1] Montgomery apparently recommended to the Board that the loan be made. On June 13, 1973, the Board met and recommended to the Credit Committee the approval of a $200,000 loan to Stowe.[2] On June 19, 1973, a local appraiser valued the property for which the loan was sought at $285,000. On June 27, Stowe formally filed an application for a loan. On June 29, he and Montgomery met in the latter's office; Montgomery told one of the disbursing officers to process the loan, which she did, returning the documents and a check to Montgomery, who signed the check and disbursed it. Also on June 29, the Board, in a telephone meeting, recommended to the Credit Committee the approval of a loan of $225,000 to Stowe. On this same date Stowe purchased the mortgaged property for $72,000.
 
 
 4
 The Credit Committee did not review the loan until four days after it was made. One member approved the loan application and initialed it, but forged the initials of another member. Approval by at least two members is required.
 
 
 5
 Stowe ultimately defaulted on the loan; the Credit Union foreclosed on the mortgage, bought the property and sold it for $64,000. After a deficiency judgment against Stowe was discharged in bankruptcy, the Credit Union brought this action against Cumis on its surety bond. The jury found Cumis liable on the bond due to the negligence of Jack Montgomery, but specifically exonerated the other employees.
 
 
 6
 The linchpin of Cumis' arguments on appeal is that the trial court applied an incorrect standard in allowing the Credit Union to recover under the bond for a loss caused by the negligent acts of an employee. It contends instead that to prove an employee's failure "to well and faithfully perform his duties," it is necessary to show intentional or willful misconduct.[3]
 
 
 7
 Insuring Clause A of the bond provided, among other things, coverage:
 
 
 8
 For direct loss of, or damage to, any property, as defined herein, caused by the fraud or dishonesty of any of the Insured's employees, as herein defined, ... or through the failure on the part of such employee ... to well and faithfully perform his duties.
 
 
 9
 The trial court, in interpreting the clause to insure against negligence, relied in part on Minor v. The Mechanics Bank of Alexandria, 26 U.S. (1 Pet.) 46, 7 L.Ed. 47 (1828). In Minor, the Supreme Court considered the argument that the language "well and truly execute the duties of cashier" was merely a stipulation for honesty, and not for skill, capacity, or diligence, but held to the contrary.
 
 
 10
 'Well and truly to execute the duties of the office,' includes not only honesty, but reasonable skill and diligence. If the duties are performed negligently and unskillfully-if they are violated, from want of capacity or want of care, they can never be said to be 'well and truly executed.' The operations of a bank require diligence, with fitness and capacity, as well as honesty, in its cashier; and the security for the faithful discharge of his duties would be utterly illusory if we were to narrow down its import to a guarantee against personal fraud only.
 
 
 11
 Id. at 69. It is true, as Cumis suggests, that the Supreme Court's statement in Minor was dicta, but it is on point and this interpretation has been adopted in later cases.[4]
 
 
 12
 We agree with the district court's holding that the quoted coverage insures against negligence. As it reasoned, Insuring Clause A covers two types of conduct-"fraud or dishonesty" and that an employee "well and faithfully perform"-if the latter clause is to have any independent significance it must mean something other than fraud or dishonesty.
 
 
 13
 Cumis next contends there was not sufficient evidence of negligence by Montgomery. We disagree. He recommended the loan to the Board without any evidence of the value of the real estate, he failed to check out the collateral, there was some evidence that he knew what Stowe actually paid for the property, and he directed another employee to process the loan as required, knowing that it had not been approved by, or even submitted to, the Credit Committee and he disbursed it to Stowe.
 
 
 14
 Stowe did not appear at trial, but the Credit Union offered his deposition in an attempt to prove that Montgomery had actual knowledge that the property was purchased for only $72,000-thus conclusively showing Montgomery's negligence. Cumis contends that Stowe's deposition testimony was inadmissible under Fed.R.Evid. 602 because Stowe had no personal knowledge of whether Montgomery knew of the purchase price. The point is not well taken. It is true that Stowe did not state definitively that he personally discussed the purchase price with Montgomery-only that it was possible-and that much of his testimony in this respect was to the effect that he thought his attorney had told Montgomery. Rule 602, however, does not require that the witness' knowledge be positive or rise to the level of absolute certainty. Evidence is inadmissible under this rule only if in the proper exercise of the trial court's discretion it finds that the witness could not have actually perceived or observed that which he testifies to. 2 J. Wigmore, Evidence § 658 (J. Chadbourn Rev. 1979); 3 J. Weinstein & M. Berger, Weinstein's Evidence, P 602(02) (1981). Although the question of admissibility was certainly close, we cannot say that the trial court abused its discretion in ruling that appellant's objection went to credibility, not to admissibility, and in admitting the evidence for the jury to determine the weight to be given to Stowe's admittedly equivocal testimony.
 
 
 15
 We have examined the other assignments of error and find them to be without merit. The judgment of the district court, 507 F.Supp. 794, is, therefore, affirmed.
 
 
 16
 AFFIRMED.
 
 CHAPMAN, Circuit Judge, dissenting:
 
 17
 I dissent based on what I consider to be the erroneous and prejudicial failure of the trial judge to strike certain portions of Stowe's deposition before its publication to the jury.
 
 
 18
 Federal Rule of Evidence 602 provides as follows:
 
 
 19
 A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness himself. This rule is subject to the provisions of rule 703, relating to opinion testimony by expert witnesses.
 
 
 20
 The most important part of Stowe's testimony is not based on personal knowledge. Stowe testified on direct examination that Montgomery had knowledge of the purchase price of Stowe's lots.[1] However, on cross examination, Stowe stated that the basis for his statement that Montgomery had prior knowledge was his assumption that his attorney, McCrackin, had told Montgomery of the purchase price.[2] During the trial it was developed through Stowe's attorney McCrackin's testimony that he had not communicated the purchase price to Montgomery or anyone at the Credit Union.[3] Thus, Stowe testified to a fact about which he had no personal knowledge but instead was based on an erroneous assumption.
 
 
 21
 In the case of United States v. Borelli, 336 F.2d 376, 392 (2d Cir. 1964), cert. denied sub. nom. Mogavero v. United States, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965), it was held that testimony should have been excluded in the absence of a showing that the witness was giving an impression derived from the service of his own senses, not from the reports of others or from speculation. In the present case, Stowe was not giving testimony about which he had personal knowledge. His conclusive statement that Montgomery knew the purchase price was speculative and based upon an erroneous assumption. It was highly prejudicial testimony because it described a specific act of negligence on the part of Montgomery. Without the inclusion of this specific act, the evidence of negligence on the part of Montgomery was rather nebulous. This prejudicial testimony went to admissibility and not to credibility. It was the most damaging evidence presented against the defendant because it indicated that Montgomery was approving a $200,000.00 loan secured by real estate purchased on the date of said loan for only $72,000.00. There is no other testimony in the record to establish Montgomery's knowledge of this most important and damaging fact. This speculation on such a critical issue should have been excluded.
 
 
 22
 For the above reasons, I would reverse.
 
 
 
 [1]
 Stowe and Jack Montgomery had known each other for some time prior to the making of this loan. They had coffee and lunch together, were golfing partners, and Montgomery was a guest on Stowe's fishing boat. In 1971, Montgomery had purchased a year-old Lincoln Continental automobile from Stowe, assuming a loan of approximately $3,800. After Montgomery left the Credit Union, he shared office space with Stowe and acquired a real estate license under his sponsorship. Fifteen months prior to the loan in question, Montgomery turned over for collection four delinquent accounts of Stowe; he subsequently cured the defaults
 
 
 [2]
 The Credit Committee apparently never received this recommendation
 
 
 [3]
 The trial court instructed the jury:
 Now, the words to well and faithfully perform his or her duties as applies to each of the employee Defendants in this case means that each of these employees must perform his or her duties with reasonable skill and diligence, that is, they must not be negligent or fail to use due care in performing their duties.
 Now, negligence means the failure to act as an ordinary and reasonable person would act under similar circumstances. Negligence, really you determine whether they well and faithfully performed their duties by determining whether they exhibited reasonable skill and diligence; and that really means were they negligent or were they not negligent.
 ....
 Now, the issues before you basically are were any of the three named employees ... negligent, because that's what failure to well and faithfully perform their duties really means. The bond says well and faithfully perform his or her duties and I have told you that that means negligence.
 
 
 [4]
 King Edward Employees Federal Credit Union v. Travelers Indemnity Co., 206 F.2d 726 (5th Cir. 1953); Morley v. McGuire, 219 Ark. 206, 242 S.W.2d 112 (1951); Frink v. Southern Express Co., 82 Ga. 33, 8 S.E. 862 (1889); Castetter v. Barnard, 98 Ind.App. 210, 183 N.E. 681 (1932); American Bank v. Adams, 29 Mass. (12 Pick.) 303 (1832); Fiala v. Ainsworth, 63 Neb. 1, 88 N.W. 135 (1901); Concord v. Peerless Ins. Co., 110 N.H. 497, 272 A.2d 588 (1970); Hoboken v. Evans, 31 N.J.L. 342 (1865); Ellison v. Hunsinger, 237 N.C. 619, 75 S.E.2d 884 (1953)
 
 
 [1]
 Pertinent portions of the direct examination of Stowe:
 Q. Did you discuss the purchase price of the properties with Mr. Montgomery?
 A. The purchase price of the properties?
 Q. Yes, sir.
 A. I know he was aware of the purchase price of the properties or approximately through Mr. McCrackin who was the attorney.
 Q. Did you ever discuss that with Mr. Montgomery?
 A. I don't recall. It's very possible I did but I just don't recall.
 Q. How do you know then if you didn't discuss it with him-how do you know Mr. Montgomery was aware of the purchase price?
 A. Again, we will have to check with Mr. McCrackin and the check was delivered to Mr. McCrackin and he made the actual disposition of the cash to whoever it was involved. I don't know how many checks were made out but we should find out how many checks were made out to begin with.
 Q. Was Mr. Montgomery aware of the purchase price of your paying for these lots?
 A. I thought he was, yes.
 Q. Did you discuss it with him?
 A. I don't recall. I think it was all brought out by Mr. McCrackin but I don't recall.
 
 
 [2]
 Relevant excerpts from the cross examination of Stowe:
 Q. Mr. Stowe, you said you assumed that Mr. or at least I understood you to say that you assumed that Mr. Montgomery knew what you were paying for the property?
 A. Yes.
 Q. You are assuming that Mr. McCrackin told him?
 A. Yes.
 Q. But that's the only basis on which you made that statement?
 A. Again, to the best of my knowledge, yes.
 Q. Let's assume that Mr. McCrackin did not tell him that information-
 A. Yes.
 Q. -do you have any other reason for thinking that Mr. Montgomery knew what you were paying for the properties?
 A. At this time, I don't have any reason, no.
 Q. So the only way that Mr. Montgomery would have known what you were paying for the properties, for a mere seventy-two-thousand dollars, it would have been from Mr. McCrackin having told him? Maybe I have expressed that awkwardly but let's go back-
 A. I don't know. I know what you are getting at but I don't know.
 Q. You didn't tell Mr. Montgomery that you were buying this property for a mere seventy-two thousand dollars?
 A. I don't recall but it's possible.
 
 
 [3]
 McCrackin testified as follows:
 Q. You knew that the purchase price was a mere seventy-two thousand dollars?
 A. Yes, I knew that was what it was. I can't think of the man's name, one of the partners, who confirmed to me this was the price.
 Q. And you did not communicate this information to anyone at the Credit Union, as far as you can recall?
 A. No.